GRIFFIS, J„
Dissenting:
¶ 16. I respectfully dissent.

A. Dismissal of Appeal Based on Improper Rule 51(b) Certification

¶ 17. The majority holds that the tidal court’s certification of the judgment under Rule 54(b) of the Mississippi Rules of Civil Procedure was improper. No party raises this as an issue. The majority on its own motion and with little explanation comes to this conclusion. The reasoning given frankly does not support the conclusion.
¶ 18. The majority reasons that the claims against Fox-Everett regarding the *89 amount of the deductible have yet to be decided by the trial court. Then, the majority claims that “the Appellees’ damages [are] intertwined with the claims regarding the deductible amount, which are not yet before this Court.” I cannot find support for this in the record.
¶ 19. The Appellants’ misrepresentation claims were only against Fox-Everett.[7] There were no claims asserted against the Appellees, Underwriters and Caronia, that relate to Fox-Everett’s misrepresentation of the deductible amount. Thus, no claims remain between the Appellants and the Appellees. I can only surmise that the majority assumes that the Appellees may somehow be liable to the Appellants on the theory that Fox-Everett was acting as the agent of the Appellees, and in such capacity, Fox-Everett bound the Appellees by its acts. This is not an allegation in this case. The majority’s assumption is clearly wrong.
¶ 20. In Stanley v. Allstate Ins. Co., 465 So.2d 1023, 1025 n. 2 (Miss.1985), the supreme court held:
The bench and bar should be apprised that under Rule 54(b), where there are multiple parties, and the trial court enters an order of dismissal as to one or more, but not all defendants, the trial judge can authorize an appeal by the plaintiff.
¶ 21. The majority relies on Cox v. Howard, Weil, Labouisse, Friedrichs, Inc., 512 So.2d 897, 898-99 (Miss.1987). The facts in Cox are not similar to the facts here. Indeed, the facts and decision in Cox support the trial court’s decision here to certify the judgments under Rule 54(b). The following are the facts in Cox:
Howard, Weil ... is a brokerage corporation with principal offices in New Orleans. In January, 1985, it filed a complaint against Walter Del Cox, Jr., in the circuit court of Warren County alleging an open account indebtedness for corporate stock transactions made through it by Cox in the amount of $59,543.
By answer and counterclaim, later amended, Cox denied the accuracy of the account. His counterclaim contained three counts. Count I alleged that Howard, Weil failed to properly process orders he made and caused a loss of $39,382.53. Count II alleged that Howard, Weil had overcharged him on commissions in the amount of $76,867. Count III alleged that Howard, Weil employed him as a branch manager at a salary plus commissions, that Howard, Weil fired him and notified various exchange boards and stockbrokers of this termination. He claimed this deprived him of other job opportunities and $3,300,000 in damages on this count. Following his deposition, in which Cox acknowledged that he had never applied for another job, Howard, Weil, moved for summary judgment to dismiss Count III of the counterclaim.
On November 7, 1985, the court entered a summary judgment in Howard, Weil’s favor as to Count III. The judgment also recited:
The Court does further find that there is no just reason for delay and expressly directs the entry of judgment in favor of the plaintiff, Howard, Weil, Labouisse, Friedricks, Inc., on Count III of the Counterclaim filed by the defendant/counterclaimant, Walter Del Cox, Jr., in this cause and directs *90 that Walter Del Cox, Jr., should take nothing under this Counterclaim.

Id.

¶ 22. Cox involved one plaintiff versus one defendant. Id. Three claims were asserted in the complaint, and one claim was dismissed. Id. The supreme court then noted that: “In complex litigation involving multiple claims or multiple parties, or both, Rule 54(b) is helpful because it allows judges to efficiently and fairly resolve separable claims before protracted litigation is finally resolved.” Cox, 512 So.2d at 900. The supreme court correctly ruled that the purpose of Rule 54(b) was not for a case like Cox. Cox squarely supports the trial judge’s decision to certify this case under Rule 54(b).
¶ 23. In this case, on August 3, 2006, the Appellants filed them complaint against Lloyds, Caronia, and Fox-Everett. The complaint alleged that “when the Plaintiffs were sued and looked to the insurance coverage, they learned that their agent of record, Fox-Everett, had grossly misrepresented the amount of the deductible, by tenfold, and Lloyds and Caronia had misrepresented Plaintiffs’ obligation to pay the deductible, and Lloyd’s duty to defend.” The Appellants asserted the following claims, the title of each is quoted verbatim from the headings in the complaint:
Count 1 — Breach of Contract (Lloyd’s)
Count 2 — Tortious Breach of Contract (Lloyd’s)
Count 3 — Breach of Contract (Fox-Everett)
Count 4 — Breach of Fiduciary Duty (Fox-Everett)
Count 5 — Negligent Misrepresentation (Fox-Everett)
Count 6 — Gross Negligence (Fox-Everett)
Count 7 — Fraud (Lloyd’s and Caronia)
Count 8 — Breach of the duty of good faith and fair dealing (Lloyd’s and Caro-nia)
¶ 24. Six counts were specifically directed to a separate defendant. Two counts were directed to Lloyd’s and Caronia. No count was directed at all three defendants. No count claims that Fox-Everett caused Lloyd’s to be liable for anything other than what was written in the policy. The majority refers to the fact that Fox-Everett was paid a commission on the sale of the policy. This was a true fact, but has no bearing on this case. The majority must concede that there was no allegation that the Appellees may be liable because Fox-Everett was paid a commission. There is certainly no claim that the Appellees are obligated to the Appellants or entitled to any relief as a result of any agency relationship the Appellees had with Fox-Everett.
¶ 25. On September 12, 2006, Lloyds and Caronia (the “Underwriters” or the “Appellees”) filed their answer, defenses and counterclaim. In the counterclaim, the Appellees 'claimed that: (1) Southern had breached the contract by failing to respond to the request for reimbursement to pay the deductible, and (2) the Appel-lees were entitled to a declaratory judgment on endorsement no. 1 of the policy that obligated Southern to pay a $250,000 deductible.
¶ 26. On August 17, 2007, the Appellees filed a motion for summary judgment.[8] *91 On the same day, the Appellees also filed a motion for partial summary judgment on their counterclaim.[9]
¶ 27. At the hearing on the motions, the Appellees’ counsel argued:
... Now, the plaintiffs in this case have alleged that that deductible was misrepresented to them in terms of the amount. That claim doesn’t have — our position is that claim doesn’t have anything to do with Underwriters and Caro-nia. That allegation is aimed at the agent, Fox-Everett, that’s a defendant in this case.
¶ 28. As a result of the motions for summary judgment, the trial court entered two separate findings of fact and conclusions of law. The court also entered a “Final Judgment” and a “Final Judgment on Counterclaim.”
¶ 29. In the “Final Judgment,” the trial court “dismisses with prejudice Counts One, Two, Seven and Eight of the Complaint as against the defendants Underwriters and Caronia.” A review of the complaint results in the conclusion that this judgment dismissed ALL of the claims that the Appellants asserted against the Appellees in the complaint. In the related findings of fact and conclusions of law, the court found that “[ejach policy contains a deductible for professional liability claims in the amount of "$250,000 each claim, Defense Costs included.’ ” Indeed, twelve times in the findings of fact and conclusions of law, the trial court referred to the “$250,000 deductible.” The trial court found that there was no genuine issue of a material fact that the Appellants were responsible to the Appellees for a “$250,000 deductible.” That issue was fully and fl-nally resolved as between the Appellants and the Appellees.
¶ 30. In the “Final Judgment on Counterclaim,” the trial court determined that the Appellees were entitled to a judgment as a matter of law that “Southern is contractually obligated under the terms of the Policy to reimburse Underwriters for the $701,153.54 in defense costs, expenses and settlements advanced within the per claim deductibles.” A review of the counterclaim results in the conclusion that this judgment awarded Appellees ALL of the relief they demanded in the counterclaim. In the related findings of fact and conclusions of law, the court included the identical language quoted above when it found that “[ejach policy contains a deductible for professional liability claims in the amount of ‘$250,000 each claim, Defense Costs included.’ ” Again, the trial court found that there was no genuine issue of a material fact that the Appellants were responsible to the Appellees for a “$250,000 deductible.” That issue was fully and finally resolved, for a second time, as between the Appellants and the Appellees.
¶ 31. The legal effect of the two final judgments entered was that the litigation was final, a judgment was entered against Southern, and the lawsuit between the Appellants and the Appellees was over.
¶ 32. Cox supports the trial judge’s decision here to certify this case under Rule 54(b). I cannot find that the trial judge was in error for granting a Rule 54(b) certification. I certainly do not find plain error. The majority cannot dispute that the lawsuit, i.e., the claims asserted, between the Appellants and the Appellees was over when the trial judge entered the *92 “Final Judgment” and the “Final Judgment on Counterclaim.”
¶ 33. The only claims that remain to be litigated are between the Appellants and Fox-Everett. Thus, there is absolutely no basis for the majority’s claim that “the Appellees’ damages [are] intertwined with the claims regarding the deductible amount, which are not yet before this Court.” The next action by the trial court will be to determine if the Appellants are entitled to a judgment from Fox-Everett. Upon the trial of that action, assuming it is adverse to Fox-Everett, there are no claims asserted that would provide that the Appellees here are responsible for any part of a judgment entered against Fox-Everett or that the earlier judgment in favor of the Appellees would be reduced or increased by one nickel.
¶ 34. The trial judge’s decision to certify this as a final judgment under Rule 54(b) was within his sound discretion as the trial judge. Indiana Lumbennen’s Mut. Ins. Co. v. Curtis Mathes Mfg. Co., 456 So.2d 750, 753 (Miss.1984). I would find that the appeal is properly before this Court.

B. Gmnt of Summary Judgment

¶ 35. The trial court’s order granting summary judgment to the Appellees should be reversed. Our standard of review requires that we conduct a de novo review. Based on my de novo review, I cannot conclude that the motions for summary judgment were properly granted.
¶ 36. The most fundamental principle in considering motions for summary judgment was announced by the supreme court in the seminal case Brown v. Credit Center, Inc., 444 So.2d 358, 363 (Miss.1983). There, the court held that, “[s]ummary judgments, in whole or in part, should be granted with great caution.” Id.
¶ 37. An appellate court’s standard of review of the lower court’s grant or denial of a summary judgment is de novo. Lewallen v. Slawson, 822 So.2d 236, 237(¶ 6) (Miss.2002). A de novo review “means that the case shall be tried the same as if it had not been tried before, and the court conducting such a trial may substitute its own findings and judgment for those of the inferior tribunal from which the appeal is taken.” California Co. v. State Oil and Gas Bd., 200 Miss. 824, 838-39, 27 So.2d 542, 544 (1946) (citing Knox, Attorney General, v. L.N. Dantzler Lumber Co., 148 Miss. 834, 114 So. 873, 876 (1927)).
¶ 38. The insurance contract is the source of the claims asserted. The Court must interpret the four corners of the contract to determine whether the contract provided for an independent contractual duty on the Appellees’ part to defend the Appellants upon notice of a covered claim, or whether the duty to defend is dependent on and arises only after payment of the deductible by the First Named Insured. This Court must also determine whether the Appellees performed their contractual obligation to defend the Appellants against the third-party tort claims within a reasonable time in accordance with the policy terms.
¶ 39. In order to prevail on a breach-of-contract claim, the plaintiff must show by a preponderance of the evidence that: a valid contract exists; the defendant breached the contract; and damages resulted from the breach. Warwick v. Matheney, 603 So.2d 330, 336 (Miss.1992). The trial court found that the contract did not require the Appellees to provide the Appellants a defense before payment of the $250,000 deductible. The trial court also made the following finding:
The Court further finds that Defendants have never denied coverage to Plaintiffs. Indeed, they exercised their option un *93 der the Policy to advance amounts within the $250,000[-]per[-]claim deductible in order to protect Plaintiffs’ interests and expeditiously settle the suits brought against Plaintiffs. As such, no reasonable person could conclude that Defendants acted in a tortious, fraudulent, or any other bad[-]faith manner in their handling of Plaintiffs’ five claims made under the Policy. Therefore, summary judgment is appropriate on all of Plaintiffs’ claims asserted against Defendants in their Complaint.
(Emphasis added).
¶ 40. The Appellees’ motion for summary judgment argued that the duty to defend as set forth in the policy was contingent upon the Appellants’ payment of the deductible. The Appellees also argue that regardless of whether the duty to defend is contingent upon payment of the deductible, the Appellees claim that they provided the Appellants with a defense in accordance with the policy, citing their successful settlement of the third-party tort suits.
¶41. To evaluate these contentions, we must examine the contractual duty to defend as set forth in the policy, focusing on when the duty to defend terminates and whether any contingency exists regarding payment of the deductible. Endorsement no. 1 to the policy states the following in pertinent part:
Section V. DEDUCTIBLE of the HEALTHCARE PROFESSIONAL LIABILITY CLAIMS MADE COVERAGE PART FOR LONG TERM CARE FACILITIES is deleted in its entirety and replaced with the following:
V. DEDUCTIBLE
A.The First Named Insured shall be responsible for the deductible amount shown in the Declarations, WHICH DEDUCTIBLE AMOUNT SHALL BE IN ADDITION TO AND SHALL NOT ERODE THE APPLICABLE LIMITS OF INSURANCE SHOWN IN THE DECLARATIONS. Expenses we incur in the investigating and defending claims and suits are included in the deductible. The deductible applies to each medical incident and the First Named Insured shall not insure against it without our written consent. All claims arising from a single medical incident or continuous, related, or repeated medical incidents shall be subject to one deductible.
B. The deductible aggregate is the total amount of damages arising out of the deductibles for all occurrences during the policy period.
C. We may pay all or part of the deductible to settle a claim or suit. The First Named Insured agrees to repay us promptly after we notify the First Named Insured of the Settlement.
¶ 42. The policy further states:
In consideration of the payment of the premium and in reliance upon the statements in the Application, which is attached hereto and made a part of this Policy, and upon the Declarations, we agree as follows!:]
I. INSURING AGREEMENT
We will pay those amounts that you are legally required to pay others as damages resulting from a medical incident arising out of professional services provided by any Insured. The medical incident must take place on or after the retroactive date and before the end of the policy period. A claim for a medical incident must be first made against an Insured during the policy period or *94 the extended reporting period, if applicable.
In addition to our Limit of Insurance we will also pay defense costs. We have the right and duty to defend and appoint an attorney to defend any suit against an Insured for a covered claim, and we will:
1. Do so even if any of the charges of the claim are groundless, false or fraudulent; and
2. Investigate and settle any claim or suit to the extent we believe is appropriate.
Our duty to defend any suit ends, and we may withdraw from the defense, after the applicable Limit of Insurance has been exhausted by settlements, judgments, awards and interest accruing thereon prior to entry of judgment or issuance of award.
¶ 43. The policy also imposed certain conditions on the policyholder, including a duty to timely notify the insurance provider of any covered claims against the insured and a duty to provide assistance to the insurance provider. The policy states:
VI. CONDITIONS
In addition to the GENERAL POLICY PROVISIONS AND CONDITIONS-Section III. CONDITIONS APPLICABLE TO ALL COVERAGE PARTS, the following Conditions apply to this Coverage Part:
B.Assistance and Cooperation
The Insured shall:
1. Cooperate with us in the investigation, settlement, or defense of the claim or suit; and
2. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply-
An Insured will not, except at the Insured’s own cost, voluntarily make a payment, assume any obligations, or incur any expense, other than for first aid, without our consent.
The “Conditions” section of the policy does not condition the contractual duty to defend on prepayment of the insurance deductible.
¶ 44. In an endorsement applicable to both the general healthcare liability and the professional healthcare liability portions of the insurance policy, the policy states:
APPLICATION OF ENDORSEMENT
C. The terms of the insurance, includ-
ing those with respect to:
1. Our right and duty to defend the Insured against any “suits” seeking those damages; and
2. Your duties in the event of an “occurrence,” “claim,” “suit” or “medical incident” apply irrespective of the application of the deductible amount.
D. We may pay any part or all of the deductible amount to effect settlement of any claim or “suit” and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.
That same endorsement contains the following language:

SUPPLEMENTARY PAYMENTS AND DEFENSE COSTS WITHIN THE LIMITS OF LIABILITY

Subject to the Deductible Liability Insurance Endorsement provisions of this policy, it is agreed that we will pay the following Supplementary Payments and Defense Costs, which will be included *95 within, not in addition to and will erode the Limits of Liability of the policy.
A. all expenses incurred by us, all costs taxed against you in any suit defended by us and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before we have paid or tendered or deposited in court that part of the judgment which does not exceed the limit of our liability thereon;
B. premiums on appeal bonds required in any such suit, premium on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of insurance of this policy;
C. expenses incurred by you for first aid to others at the time of an accident, for Bodily Injury to which this policy applies;
D. reasonable expenses incurred by you at our request in assisting us in the investigation or defense of any claim or suit, including actual loss of earnings;
E. all defense costs, which shall mean all costs of investigation, adjustment and defense of claims, including court costs, interest on judgments, premiums on bonds and legal fees arising directly from claims covered by this policy (but excluding the expense of salaried employees of counsel on retainer by and office expenses of you and us) provided such claims expenses are incurred by or with our prior written permission.
This endorsement contains no provision requiring prepayment of the deductible as a condition for providing a defense to the Appellants, as required by the contract.
¶ 45. Lastly, the deductible liability insurance endorsement, which applies to both the general healthcare liability claims and the professional healthcare liability claims contains the following provision:
A. Our obligation under the Bodily Injury Liability, Property Damage Liability, Medical Expense and Medical Incident Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.
C. The terms of the insurance, including those with respect to:
1. Our right and duty to defend the Insured against any “suits” seeking those damages; and
2. Your duties in the event of an “occurrence,” “claim,” “suit” or “medical incident” apply irrespective of the application of the deductible amount.
D. We may pay any part or all of the deductible amount to effect settlement of any claim or “suit” and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.
¶ 46. The Appellees point to the above provisions to support their contention that their duty to pay costs, whether defense or indemnity, was not triggered until the Appellants met the policy deductible. However, this provision of the policy requires the Appellants to pay the deductible before the Appellees’ duty to pay damages arises. The endorsement fails to address defense costs or to define defense expenses as damages. Instead, the endorsement and the underlying policy clearly give the Ap-pellees the right to reimbursement of any defense costs, including settlement costs, incurred within the deductible amount.
¶ 47. However, by the same terms of the policy, the Appellees’ contractual duty *96 to defend, and to be reimbursed therefor within the deductible amount, constitutes a separate and distinct duty from the Appel-lees’ contractual duty to pay damages within the limits of the policy after the insured pays damages in the amount of the deductible. In short, neither this endorsement, nor the policy as a whole, link the duty to defend to the Appellants’ prepayment of the deductible.
¶48. The Mississippi Supreme Court addressed an insurance company’s duty to defend its insured in Moeller v. American Guarantee and Liability Insurance Co., 707 So.2d 1062 (Miss.1996). The court in Moeller held that an insurer has an absolute duty to defend claims against the insured which ai*e covered by the policy. Id. at 1069. The Moeller court stated the following:
Liability policies generally, as in this case, by specific language give the carrier the right to select and employ defense counsel. Moreover, whenever a lawsuit filed against an insured contains an allegation or claim which is covered under the policy, the insurance carrier has a contractual duty to furnish a legal defense, whether the claim later proves to meritorious or not.... Thus, the obligation of the carrier is two-fold: first, to furnish a legal defense to the claim covered under the language of the policy and, second, to pay all sums the insured becomes legally obligated to pay therefor.
Id. at 1068-69.
¶ 49. The Appellees clearly disputed the policy’s coverage as to certain claims in the underlying tort suits, as evidenced by the reservation-of-rights letters the Appel-lees sent to the Appellants. The reservation-of-rights letters state that: Underwriters will not defend claims pertaining to the period of time prior to the retroactive date of the policy; Underwriters would defend claims related to claims of fraud, but it would provide no indemnity on those claims; Underwriters would not indemnify the Appellants for punitive damages; and Underwriters reserved the right to disclaim coverage for contractual damage claims until they could determine whether the policy covered those claims. The Ap-pellees acted within their contractual rights in reserving the right to later deny coverage to the Appellants with respect to non-covered claims under the policy; however, the Appellees were still obligated to defend the Appellants on the tort claims covered under the policy. Id. The Moeller court addressed the duty to defend in the context of a dispute over whether certain claims were covered under the policy, stating the following:
The liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy; it clearly has no duty to defend a claim outside the coverage of the policy. What about the special situation where the allegations of the complaint are covered by the liability policy, but the facts are such that it may very well develop at trial that the conduct of the insured was not covered by the policy? Or, the allegations of the complaint themselves are ambiguous so that read in one way there is no coverage, but read in another there is? Unquestionably, the insurance carrier has a right to offer the insured a defense, while at the same time reserving the right to deny coverage in [the] event a judgment is rendered against the insured.
When defending under a reservation of rights, however, a special obligation is placed upon the insurance carrier. While this Court has not been called upon to address this issue, other jurisdictions have generally held that in such *97 a situation, not only must the insured be given the opportunity to select his own counsel to defend the claim, the carrier must also pay the legal fees reasonably incurred in the defense.
Id. at 1069 (internal citations omitted). See also Am. Guar. and Liab. Ins. Co. v. 1906 Co., 273 F.3d 605, 608 (5th Cir.2001).
¶ 50. Under the supreme court’s holding in Moeller and by the unambiguous terms of the contract, the Appellees clearly had a duty to defend the Appellants on the tort claims that were covered by the policy. Furthermore, the policy language itself clearly requires the Appellees to defend the covered claims raised against the Appellants. The policy contains no language requiring the insured to pay the deductible before the insurer’s duty to defend arose. Moreover, the supreme court has held that “[a]n insurance company’s duty to defend its insured is triggered when it becomes aware that a complaint has been filed which contains reasonable, plausible allegations of conduct covered by the policy.” Baker Donelson Bearman & Caldwell, P.C. v. Muirhead, 920 So.2d 440, 451(¶ 41) (Miss.2006).
¶ 51. The Mississippi Supreme Court meant exactly what it said when it ruled that a “liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy....” Moeller, 707 So.2d at 1069. A defense is required.
¶ 52. Professor Jeffrey Jackson, in his treatise Mississippi Insurance Law and Practice, § 11.16 (2008), examines the withdrawal of a tendered defense. He cites to Southern Farm Bureau Casualty Insurance Co. v. Logan, 238 Miss. 580, 589-90, 119 So.2d 268, 272 (1960) (internal citation omitted) for the following proposition:
Laying aside the question of the duty of insurer to defend, the fact that the insurer assumes the defense may give rise to a duty to continue with the defense and make the insurer liable for its withdrawal therefrom, though it would not have been liable if it had not assumed the defense in the first instance. And the general rule is that an insurer who withdraws from the defense of an action is estopped to deny liability under the policy if its conduct results in prejudice to the insured; but it is not estopped to do so if its action does not result in any prejudice to the insured.
Professor Jackson also cites to Twin City Fire Ins. Co. v. City of Madison, Miss., 309 F.3d 901, 906 (5th Cir.2002) for the conclusion that:
The district court concluded that, as a matter of law, estoppel cannot expand coverage in the face of an otherwise applicable policy exclusion. We disagree. When the alleged misconduct of the insurer concerns the duty to defend, the insurer may be liable despite an exclusion otherwise applicable. Upon withdrawal from the defense of an action, for example, an insurer may be estopped from denying liability under a policy, if its conduct results in prejudice to the insured. Southern Farm Bureau Cas. Ins. Co. v. Logan, 238 Miss. 580, 119 So.2d 268, 272 (1960). Even if the insurer would not have been liable had it not assumed the defense in the first instance, it may become liable for withdrawing, because the assumption of the defense may give rise to a duty to continue with the defense. Id., 119 So.2d at 272. Additionally, a breach of the duty to defend renders the insurer liable to the insured for all damages, including in a proper case the amount of the judgment rendered against the insured.
¶ 53. Southern paid the policy premium. Southern was the “First Named Insured.” Only the “First Named Insured” was re *98 sponsible for the deductible. Neither Da-leson nor Medforce were First Named Insureds. The Policy did not require either Daleson or Medforce to pay or reimburse the Underwriter for any deductibles as a condition to coverage, which included the duty to defend.
¶ 54. Also, the Appellees did not seek payment of the deductible from Southern until after Daleson and Medforce were forced into bankruptcy. The bankruptcies did not occur until after the five lawsuits were filed, and the Appellees refused to honor the duty to defend.
¶ 55. Even if the Appellees had properly sought payment of the deductible from Southern, the insurance policy clearly does not require or authorize prepayment of the deductible as a condition precedent to Underwriters’ duty to defend the insureds, Daleson and Medforce. I frankly do not see how such argument could be advanced.
¶ 56. After Medforce and Daleson were served with process, proper notice of the lawsuits was provided to the Appellees. In response, Christopher J. Sabella, Litigation Supervisor for Caronia, sent detailed letters titled, “Acknowledgment of Suit Reservation of Rights.” In the letter dated November 20, 2003, Caronia acknowledged the receipt of the complaint, the existence of the lawsuit, and the obligation to defend. The letter advised:
We have retained the firm of Ramsey & Hammond to represent [the Appellants] .... As you are aware Southern Healthcare Services, Inc., ... has a $250,000 self-insured retention for each and every professional liability claim. Therefore, the first $250,000 of indemnity and/or claims related expenses will be paid directly by Southern Healthcare Services, Inc., Willow Creek Retirement Center. Given the period of allegations, Lloyds of London will agree to a fifty percent (50%) allocation of expense costs on this file. Therefore, fifty percent (50%) of all defense costs will be applied to the self[-]insured retention.
In three of the letters, dated on December 7 and 8, 2004, the Appellees made the same acknowledgments and advised:
We have retained the firm of Currie, Johnson, Griffin, Gaines and Myers to represent [the Appellants].... As you are aware Southern Healthcare Services, Inc., ... has a $250,000 deductible for each and every Professional Liability claim. Therefore, the first $250,000 of indemnity and/or claims related expenses will be paid directly by Southern Healthcare Services, Inc.
In a letter dated November 9, 2004, the Appellees denied coverage and informed the Appellants that it would provide no defense under the terms of the policy.
¶ 57. Except for the denial of coverage letter, each letter conditions coverage upon the insured first paying the “self[-]insured retention” or the “deductible.” The unambiguous language of the policy does not support this condition. Indeed, the policy provides for just the opposite. The policy contemplated that the insurer will first incur expenses, and the deductible will be reimbursed after such costs are paid. There was no policy language that required the insured to pay the full amount of the deductible to counsel hired to defend the lawsuits. If this were the case, it would be reasonable to expect such condition to be found in the policy or an endorsement.
¶ 58. Under the policy, the Appellees had the right to reimbursement of the deductible, but they had absolutely no contractual right to demand payment of the deductible before the insured had a duty to defend. If the Appellees had no right, to condition the duty to defend on the prior payment of the deductible, the Appellees *99 were in breach of the insurance contract the moment the “Acknowledgment of Claim Reservation Rights” letters were mailed. At that moment, the Appellees breached the duties required of an insurance carrier under Moeller and under Hartford Accident & Indemnity Co. v. Foster, 528 So.2d 255, 263 (Miss.1988).
¶ 59. The trial judge was in error to determine that the Appellees performed their duties under the ' contract because they settled and defended the third-party tort claims against the Appellants. This finding was based on the conclusion that the Appellees never denied coverage and did indeed settle the claims against the Appellants. As a result, the trial judge concluded that no reasonable juror could conclude that the Appellees acted in a tortious, fraudulent, or any other bad-faith manner in them handling of the five tort claims. I disagree.
¶ 60. The time of performance that we must consider is the time just after the reservation-of-rights letters were sent. Since the Appellees failed to accept the duty to defend the lawsuits, they were in material breach of the insurance policy. The subsequent provision of a defense was not sufficient to defeat the Appellants’ claims. Such actions may mitigate the Appellees’ damages, but they do not provide the basis for a judgment as a matter of law.
¶ 61. In Monticello Insurance Co. v. Mooney, 733 So.2d 802, 804(¶3) (Miss. 1999), a building owned by Joyce Mooney was destroyed by a fire. The building was insured under two insurance policies, including one by Monticello Insurance Company. Id. at (¶ 4). Because arson was suspected, the insurance policy required that Joyce and her husband, Ralph Mooney, both submit to examinations under oath and produce personal and business financial records. Id. at (¶ 6). This was despite the fact that the insurance policy listed Joyce as the sole insured. Id. at (¶ 5). Only Joyce submitted to the examination and no financials were produced. Id. at (¶ 6). Later, the Mooneys offered to provide the records requested. Id. at 805(¶ 9). By the time the Mooneys offered to cure the breach, Monticello had already filed an action seeking a declaratory judgment action concerning the matter. Id. at (¶ 8). The court found that the belated offer, after suit had been filed, did not cure the previous breach of the policy. Id. at 808(¶ 25).
¶ 62. Similarly, in this case, the Appel-lees’ belated defense of the claims against the Appellants did not cure the Appellees’ breach of the absolute duty to defend their insured. The Appellants clearly had to take additional and unnecessary legal steps to force the Appellees to provide a defense that was the legal and contractual duty of the Appellees. See id. at (¶ 26). Accordingly, I find genuine issues of material fact exist as to whether the Appellees breached their duty to defend.

C. Conclusion

¶ 63. I am of the opinion that the trial judge’s Rule 54(b) certification was proper. I find that it was reversible error to grant summary judgment; therefore, I would reverse the final judgments entered by the trial court and remand this case for a trial on the merits.

. In the "Itemization of Facts Relied Upon and Not Genuinely Disputed,” the Appellees state that "[t]he only Counts in the Complaint in which Plaintiffs [Appellants] allege misrepresentation as to the deductible amount are those against their broker-agent, Fox-Everett."

. In the motion for summary judgment, the Appellees stated that "[t]he basis for this Motion is enumerated in the Defendant’s Memorandum in Support of Their Motion for Summary Judgment or, in the Alternative, For Partial Summary Judgment on Multiple Claims, which is being filed simultaneously herewith and is fully adopted and incorporal- *91 ed as if stated in full herein.” The memorandum was not included in the record.

. As in the previous footnote, the motion stated that the basis for the motion was in the attached memorandum, and the memorandum was not included in the record.